IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ERICK PETERSON,

                Plaintiff,

      v.

MICHAEL MEISNER, JANEL NICKEL,
LON BECHER, TIMOTHY CASIANA, RYAN
BLOUNT, NATHAN PRESTON, TRACY           OPINION & ORDER
KOPFHAMER, BENJAMIN NEUMAIER, SCOTT
ROYCE, TRAVIS HAAG, DAVID HAUTAMAKI,     15-cv-49-jdp
DALIA SULIENE, MELISSA THORNE, EMILY
STEELE, KAREN ANDERSON, JOANNE LANE,
CATHY FRANCOIS, CINDY O'DONNELL, DEIRDRE
MORGAN, DENNIS SCHUH, CHARLES FACKTOR,
DENNIS RICHARDS, and ALEXANDER AGNEW,

                Defendants.

Pro se prisoner Erick Peterson is proceeding on a number of claims arising out of a cell extraction that took place in July 2012. Peterson alleges that various officials used excessive force against him, provided inadequate medical care for his injuries, wrongfully denied his grievances, and failed to provide due process in the context of both the disciplinary proceedings and the criminal case filed against him related to his conduct during the cell extraction.

Most of the defendants have filed motions for summary judgment in two groups, those who are employed by the state (Michael Meisner, Janel Nickel, Lon Becher, Timothy Casiana, Ryan Blount, Nathan Preston, Tracy Kopfhamer, Benjamin Neumaier, Scott Royce, Travis Haag, David Hautamaki, Dalia Suliene, Melissa Thorne, Karen Anderson, Joanne Lane, Cindy Francois, Cindy O'Donnell, Deirdre Morgan, Dennis Schuh, and Charles Facktor), and two defendants who are employed by Columbia County (Dennis Richards and Alexander Agnew). Dkt. 69 and Dkt. 75. I will refer to the first group as "the state defendants" and the second

group as "the county defendants." Defendant Emily Steele is not included in either group.[1] Although she was served with the complaint, Dkt. 64, she has not yet filed an answer.[2]

I will deny the state defendants' motion for summary judgment as to most aspects of the excessive force claim because it is clear that the parties genuinely dispute many of the facts relevant to whether the force the officers used was excessive. I will also deny the state defendants' motion for summary judgment on the question whether defendant Suliene failed to provide adequate medical care to Peterson when she first examined him on August 30 and the question whether Suliene used medical judgment when delaying treatment for Peterson's ulnar neuropathy for more than two months. I will grant the state defendants' summary judgment motion in all other respects and will grant the county defendants' summary judgment motion in full.

As for defendant Steele, it appears to be clear from the undisputed facts that Peterson cannot show that she violated his rights under the Eighth Amendment. Accordingly, I will direct Peterson to show cause why his claim against Steele should not be dismissed.

Also before the court is the parties' motion to change the trial date. Dkt. 102. Because the November 13, 2017 trial date is no longer feasible, I will grant the motion and strike the trial date. Once I resolve Peterson's claim against Steele, I will schedule a telephone conference to determine a new trial date and trial-related deadlines.

---

[1] For reasons they do not explain, the state defendants included Steele on their docket entries for all of their summary judgment submissions. But the state defendants' actual motion for summary judgment is not filed on behalf of Steele. Dkt. 75.

[2] The Wisconsin Department of Justice declined to accept service for Steele on the ground that she "was a contract employee," Dkt. 48, so she was served by the United States Marshals Service.

# UNDISPUTED FACTS

The following facts are undisputed, unless otherwise noted.[3]

## A. Ice medical restriction

At the time relevant to this case, Peterson was incarcerated at the Columbia Correctional Institution, which is in Portage, Wisconsin. On July 19, 2012, Peterson submitted a health service request in which he complained about joint pain in his fingers, knees, back, and neck. Defendant Dalia Suliene, a physician at the prison, examined Peterson and prescribed ibuprofen and ice twice a day to address his joint pain. Suliene also observed that Peterson was sweating a lot, which she believed was due to his large size. (At the time, Peterson weighed almost 400 pounds.) She prescribed a wash cloth to address the sweating.

## B. Events on July 24, 2012

### 1. Dispute about ice

On July 24, 2012, defendant Nathan Preston (a correctional officer at the prison) delivered ice to Peterson in accordance with the medical restriction. Preston brought the ice in a bag, but Peterson said it was supposed to be in a cup. Peterson says that Preston also put black pepper on the ice, but Preston denies this.

---

[3] Peterson did not submit proposed findings of fact or responses to defendants' proposed findings of fact, as required by this court's procedures, but he did submit a declaration and accompanying exhibits. Because Peterson is proceeding pro se and because the evidence he submitted is not voluminous, I have overlooked Peterson's failure to comply with the rules and considered directly whether his declaration or exhibits create any genuine issues of material fact. I have treated all of defendants' properly supported proposed findings of fact as undisputed unless Peterson's evidence contradicted a particular proposed fact. In the future, if Peterson fails to comply with court procedures, he runs the risk that the court may disregard his submissions.

Preston contacted defendant Melissa Thorne, a nurse in the health services unit, who informed Preston that the ice was supposed to be in a bag. When Preston refused to put the ice in a cup, Peterson stated, "what the fuck is this shit you playing games and bullshit with my ice." Peterson began to kick and bang on his cell door. Despite several orders to stop, Peterson continued this behavior from 6:45 p.m. to 7:25 p.m.

Peterson called Preston "scum of the earth" and a "dirtbag." Preston contacted defendant Timothy Casiana, a correctional officer supervisor, to inform Casiana what was happening. Casiana told Preston to tell Peterson that he would receive a conduct report and be transferred to "DS-1" if he did not stop his disruptive behavior. DS-1 stands for disciplinary segregation 1, which is a more restrictive unit where prisoners are initially housed in response to behavioral problems.

Around 8:30 p.m., Preston was distributing medication. Preston alleges that Peterson said, "Preston if you don't get me my second bag of ice for this shift I am going to fucking kill you and I want a white shirt right now bitch." Peterson says he threatened only to file a lawsuit.

2. **Decision to move Peterson**

Preston notified Casiana about the alleged threat and then wrote Peterson a conduct report for making threats, disrespectful conduct, and disobeying orders. Casiana directed Preston, along with defendants Tracy Kopfhamer, Benjamin Neumaier, and Scott Royce (all correctional officers) to move Peterson to DS-1.

Kopfhamer told Peterson to place his hands through the trap in the cell door so that he could be restrained and escorted to DS-1. Peterson refused multiple times. Peterson says this was because Casiana refused to return the ice and the document showing Peterson's medical restriction.

Peterson complained to Casiana about the issue with the ice. Casiana told Peterson that he would look into the complaint, but that Peterson needed to be moved to DS-1 now. Peterson refused to leave the cell until the issue about the ice was resolved. Casiana told Peterson that he would address the issue after Peterson was moved.

Peterson continued to refuse to move. He stated, "put on your rubber chicken suits and get your gas and come in and get me. I know all about that gas." Casiana again stated that he would look into the medical issue, but he perceived Peterson's statement to be a threat. Officers left the area to allow Peterson to calm down.

Casiana returned and asked Peterson whether he would allow himself to be restrained for a transfer to DS-1. Peterson refused and repeated his demand for ice in a cup. Casiana said that he would get the ice, but Peterson would still be moved.

Casiana called staff in the health services unit, who stated that Peterson was supposed to receive ice in a bag. Casiana repeated this information to Peterson, who began to argue again.

Casiana gave Peterson one more opportunity to comply. This time, Peterson agreed and placed his hands through the trap. Kopfhamer restrained Peterson's wrists. Kopfhamer told Peterson to back out of the cell when the door opened. Peterson did not comply with this order but instead "stood sideways" at the door. Peterson says that he could not comply with the order because the officers did not open the door far enough for his large frame to fit through it.

### 3. Use of force

In response to Peterson's failure to comply with the order, defendants Neumaier, Kopfhamer, and Royce placed Peterson in a hold. One officer was on each side holding Peterson's arm and wrist and applying pressure downward on his wrists. Peterson says that

Casiana "intentionally twisted [Peterson's] right hand within the handcuff," Dkt. 94, ¶ 18, causing great pain.

Unspecified staff told Peterson to face the cell door. Officers placed a waist belt on Peterson and directed him to open his hands so that they could determine whether he was concealing anything. Peterson initially refused but eventually complied.

Peterson refused multiple orders to face forward and instead turned his head to look at staff. He then flexed his shoulders and back muscles and clenched his hands together. Peterson says he clenched his hands together to prevent further injury to his hand and wrist. Peterson also says that he complained to Casiana at this point about how much pain he was in.

Casiana directed the officers to press Peterson against the wall to gain control of him. Peterson says that defendants "slammed [his] head into the concrete wall." *Id.*, ¶ 21. When Peterson attempted to pull away from the officers' hold on him, Neumaier and Kopfhamer attempted to apply more pressure to Peterson's wrists, but Peterson grabbed on to the cell door handle. Peterson says he did this "to keep from falling." *Id.*, ¶ 22.

Casiana directed the officers to bring Peterson to the floor, but they were unable to do so. Defendants say that Neumaier used his knee to strike Peterson's thigh in an attempt to create muscle dysfunction and allow the officers to regain control. Peterson says that the officers "mobbed" him, "punching and kicking him" and "pulling [him] to the floor while applying extreme pressure to [his] pressure points*." Id.*, ¶ 23.

Casiana "secured Peterson's head from the inside position based on the way he was positioned," but Casiana "was unable to position himself directly behind Peterson." Dkt. 87, ¶ 112. Peterson ended up on the floor on his stomach.

According to Peterson, the officers "attacked" him once he was on the floor, "manipulating several pressure points to cause pain." Dkt. 94, ¶ 24. The officers hit Peterson's right leg with a metal baton. Officers applied "wrestling holds" to Peterson's upper body and were "going for" his neck. *Id.*, ¶¶ 29–31. One of the officers "entered [Peterson's] mouth and began to force [his] chin to [his] neck/chest, choking [him] with [his] own chin." *Id.*, ¶ 33.

According to defendants, Peterson kicked his feet at the officers and bit Casiana's right forearm, continuing to pull from the officers' hold on him.

Casiana "struck his man-down alarm," Dkt. 87, ¶ 117, and Travis Haag, a sergeant, responded to the call. Haag and Casiana performed a "trained head control technique" to prevent Peterson from biting. *Id.*, ¶ 119. Haag turned Peterson's head to the side, placed one hand above Peterson's ear on the side of Peterson's head, and placed Haag's other hand below Peterson's ear on the same side of Peterson's head, the side that was facing up. With his arms extended, Haag pressed down on Peterson's head.

Officers Rataczak, Kyburz, and Risen (not defendants) arrived on the scene. They assisted in securing Peterson and placing leg restraints on him. Peterson says that the officers put the restraints on so tightly that the "edges of the cuffs d[u]g into [his] skin." Dkt. 94, ¶ 28.

Peterson calmed down and officers assisted him to his feet. Rataczak relieved Haag and "took control of Peterson's head," using the same technique as Haag. *Id.*, ¶¶ 125–26. Haag placed his right hand on the back of Peterson's right hand and "attempted to move Peterson's hand towards Peterson's forearm in an attempt to cause discomfort and pain to generate voluntary compliance." *Id.*, ¶ 128.

Officers brought Peterson to the dayroom, where he was placed in a wheelchair and taken to the health services unit. To prevent Peterson from biting, Rataczak "placed one hand

under Peterson's chin and one hand on Peterson's forehead, and pulled Peterson's head back to rest on his chest or head rest of a restraint chair if one was in place." *Id.*, ¶ 131. Neumaier and Haag held Peterson's arms down on the armrest.

### 4. Examination in the health services unit

Officers took Peterson to the health services unit, where defendant Thorne examined him. Peterson says that Haag "appl[ied] constant painful pressure to pressure points in [Peterson's] chin and jaw," preventing him from talking to Thorne. Dkt. 94, ¶ 38. Peterson also says that Casiana directed Thorne's examination.

Haag denies that he was holding Peterson's head during the exam. Rather, Haag says Rataczak was holding Peterson's head in place. Casiana denies that he spoke for Peterson during the exam.

Thorne's examination focused on Peterson's ankle. Thorne did not observe any deformity, swelling, bruising, or redness, but she did observe that the ankle had a limited range of motion because of pain. She determined that Peterson did not require treatment beyond the ibuprofen and ice that he was already prescribed.

### 5. Placement in DS-1

After the exam, Peterson needed to ascend a flight of stairs to get to his cell. Peterson says that the officers told him to walk up them himself. When he told them that he could not do so because of his injuries, they "dragged" him up the stairs. *Id.*, ¶ 41. According to defendants, officers "maintained a hold on Peterson's head and an officer was located at each arm to assist Peterson as he walked up the stairs." Dkt. 87, ¶ 139. Peterson was then placed in a cell on DS-1.[4]

_____

[4] Officers also strip searched Peterson, but facts related to that conduct are no longer relevant

### C. Follow-up medical care

#### 1. Peterson's attempts to obtain medical care before August 30, 2012

Defendant Emily Steele is a phlebotomist, which is someone who is trained to draw blood. On July 26, 2012, Steele drew Peterson's blood "because Peterson had bitten Casiana during the altercation on July 24, 2012." *Id.*, ¶ 177. Peterson says that Suliene was present as well and that he tried to show both Suliene and Steele his bruises, but Steele told him to file a health service request and Suliene said that she was there for another patient and did not have time to examine him. Suliene denies that she was present at this appointment.

Peterson filed a health service request in which he alleged that his wrist was broken and his arm was fractured. In response, a nurse (not a defendant) informed Peterson that he was scheduled to be seen in the health services unit, but the nurse did not say when. According to defendants, Peterson was scheduled to be seen on July 27, but he refused to see nursing staff on that date. Peterson denies that he refused an appointment and says that no one told him about the appointment or came to bring him to the appointment.

On August 2, Peterson wrote defendant Karen Anderson, the health services unit manager, that he had not received treatment for painful and debilitating injuries he sustained during the use of force. In response, a nurse (not a defendant) told Peterson to submit a health service request.

On August 7, Peterson submitted a health service request about bruising and numbness in his right calf and painful spasms and weakness in his right hand and wrist. On August 10, a nurse (not a defendant) examined Peterson. He said that he felt "electrical twinges" in his right

---

because I dismissed the strip search claim for Peterson's failure to exhaust his administrative remedies. Dkt. 52.

hand and pain whenever he tried to grip something because he had been cuffed too tightly. He acknowledged that he suffered from carpal tunnel syndrome. (Peterson concedes that he began suffering from carpal tunnel syndrome long before the use of force incident. Dkt. 94, ¶ 18.) He also said that his right leg was numb from the knee down. The pain was an eight out of ten at its worst, but ibuprofen helped the pain somewhat.

The nurse observed "faint bruising" on Peterson's right wrist, but no swelling or limitations in the wrist's range of motion. His grip strength was weaker in his right hand than his left. She also observed a bruised area on his right calf, approximately four inches by two inches wide, but no swelling or reduced range of motion.

The nurse scheduled Peterson to see a physician the following week to determine whether he needed further treatment. In the meantime, she directed him to continue taking ibuprofen.

On August 12, Peterson submitted a health service request in which he asked why he had not seen a physician yet. In response, a nurse (not a defendant) wrote that Peterson was scheduled to see a physician that week. When he was not called for an appointment, he submitted another request on August 17. In response, a nurse (not a defendant) stated that the physician was not at the prison that week, but an appointment would be scheduled the following week.

### 2. Treatment by defendant Suliene

On August 30, defendant Suliene examined Peterson to assess his complaints of right wrist pain and right calf numbness. She observed no hematoma or tenderness at either location. Suliene says that she prescribed ibuprofen and capsaicin cream (a topical pain reliever).

Peterson says that Suliene conducted "a brief visual examination but provided no treatment or pain relief whatsoever for [his] injuries." Dkt. 94, ¶ 54.

On September 6, Suliene ordered an electromyography (EMG) and a splint for Peterson's right wrist because of his history of carpal tunnel syndrome. (The parties do not say what prompted the order.) An electromyography is a diagnostic procedure to assess the health of muscles and the nerve cells that control them. On September 7, Peterson received a brace for his wrist.

In late September 2012, Suliene examined Peterson again for complaints of continued pain and numbness in his right leg. Suliene observed that the leg appeared normal. "It was soft with no signs of any abnormalities, no trebble on the right lower leg and Peterson was ambulating very comfortably on both legs without any signs of limp or discomfort. Suliene found no visible signs of injury." Dkt. 87, ¶ 206. She noted that Peterson had been diagnosed with degenerative joint disease in both knees, but that he denied he had any pain in his joints. She decided to treat Peterson's pain with ibuprofen as needed.

On September 28, Suliene ordered an ultrasound of Peterson's leg to rule out deep vein thrombosis.

On October 31, Suliene prescribed acetaminophen and gabapentin for his calf pain and splints for his carpal tunnel syndrome.

Around the same time, the results for the EMG of Peterson's right wrist came back. They showed that Peterson suffered from both carpal tunnel syndrome and ulnar neuropathy. (Peterson says the results also showed that he suffered from radial nerve damage, but neither Peterson nor defendants submitted a copy of the test results.)

On November 1, Suliene met with Peterson to follow up on the EMG results. Peterson wanted surgery for both of his wrists, but Suliene decided to continue the same treatment and follow up in one month. On November 2, Suliene ordered an EMG of Peterson's right lower leg for radiculopathy.

On November 23, Suliene renewed Peterson's prescription for capsaicin cream.

On December 6, Suliene ordered more splints for Peterson's wrists, but he said that he would not wear them. She also increased the dosage of his gabapentin for pain.

On January 3, 2013, Suliene ordered a consult with an orthopedic specialist for carpal tunnel syndrome and ulnar neuropathy.

### 3. Transfer to another prison

On January 17, 2013, Peterson was transferred to the Green Bay Correctional Institution. A February 2013 x-ray of his right arm showed "right ulnar styloid fractures," Dkt. 92-9, but also that there was no acute fracture and no dislocation, Dkt. 92-2. A January 2014 MRI showed "a fracture . . . through the ulnar styloid." Dkt. 92-8.

## D. Grievances

In a grievance dated July 27, 2012, Peterson alleged that he had not yet received treatment for "extremely painful" injuries inflicted by staff. Defendant Joanne Lane, an inmate complaint examiner, contacted defendant Anderson, the health services unit manager, who stated that Peterson had received care in the health services unit but no one had photographed his injuries. Lane recommended dismissal of the claim because a nurse had examined Peterson on July 24. Lon Becher, the reviewing authority, affirmed the dismissal. Charles Facktor, the corrections complaint examiner, also affirmed the dismissal, noting that additional medical staff had provided treatment to Peterson since he filed his grievance.

In a grievance dated August 11, 2012, Peterson alleged that staff stated falsely that he had refused a medical appointment on July 27, 2012. The grievance examiner contacted Anderson, who referred to a document showing that Peterson had refused treatment on July 27. The examiner recommended dismissal and that decision was affirmed on appeal.

In a grievance dated August 29, 2012, Peterson alleged that his right leg was "partially numb" and "has a severely painful area which is continuing to get worse" and that his right hand was "still weak." Dkt. 92-4. He complained that a doctor had not examined him yet. Defendant Lane recommended dismissal of the complaint. Lane wrote that she had contacted defendant Anderson, who informed Lane that a nurse had examined Peterson on July 24, 2012, "bilateral knee x-rays and labs were completed on 7/25/2012," Peterson had refused an appointment on July 27, 2012, a nurse examined Peterson on August 10, and a doctor examined Peterson on August 30.[5]

## E. Disciplinary proceedings

A disciplinary hearing was scheduled on the conduct report that Peterson received related to his conduct on July 24, 2012. The charges included battery, threats, and disobeying orders. Dkt. 83-1, at 13.

Prison rules in effect at the time allowed an accused prisoner to call the staff member who wrote the conduct report and two other witnesses, unless the prisoner showed good cause

---

[5] Defendants do not allege that staff actually took x-rays of Peterson's knees on July 25, 2012. They say that the information Anderson gave Lane came from Peterson's "medical records," Dkt. 87, ¶ 240, but they do not cite any records reflecting that treatment. Although Peterson accuses Anderson of falsifying documents, he cites no evidence to support a conclusion that Anderson's statement was anything other than a mistake. Regardless, Peterson's complaint was that he had not seen a doctor yet, and he had already seen Suliene by the time Lane consulted Anderson, so the grievance was moot. Any inaccuracy about x-rays in Anderson's statements is not relevant to the claims in this case.

for calling additional witnesses. Peterson requested the attendance of five prisoner witnesses at the hearing, stating that he was requesting three additional witnesses "due to the seriousness of the charges," Dkt. 83-1, at 35, but he did not explain how that issue related to the number of witnesses he wanted to call. He also wrote that "the entire tier" witnessed the incident, but he provided no foundation for that conclusion and he did not explain how the testimony of the three additional witnesses would be any different from the other two.

Defendant Janel Nickel, the prison's security director, denied Peterson's request for additional witnesses on the ground that he failed to show good cause. Defendant Cindy O'Donnell, the designee for the Secretary of the Department of Corrections, affirmed the decision to dismiss Peterson's inmate complaint on this issue, again because Peterson failed to show good cause.

The hearing officer found Peterson guilty of all charges and sentenced him to eight days of adjustment segregation and 360 days of program segregation.

## F. Criminal investigation

Defendant Alexander Agnew is a detective sergeant with the Columbia County sheriff's department. Agnew's supervisor assigned him to investigate the July 24, 2012 incident between Peterson and prison staff. On August 14, 2012, Agnew interviewed Peterson and Casiana and reviewed incident reports and photographs of a bite mark on Casiana's arm. After completing his investigation, Agnew concluded that Peterson had assaulted Casiana by biting his arm. Both Agnew and the state defendants deny that they lied to law enforcement officers about the July 24 incident.

Dennis Richards is the sheriff of Columbia County, Wisconsin. He had no discussions with Agnew or prison officials about the allegations against Peterson and he made no decisions about the investigation.

On October 3, 2012, Peterson was charged with battery and disorderly conduct. The battery charge was dismissed, but Peterson was convicted of disorderly conduct and he did not appeal the conviction.

ANALYSIS

A. Overview of claims

Peterson is proceeding on the following claims:

(1) Defendant Preston tampered with the ice that had been prescribed to Peterson, in violation of the Eighth Amendment.

(2) Defendants Casiana, Haag, Kopfhamer, Royce, and Neumaier used excessive force against Peterson in the context of a cell extraction and then dragged him up a flight of stairs.

(3) Defendant Haag interfered with Peterson's medical examination and used excessive force against Peterson by putting pressure on his head and preventing him from talking, and defendants Casiana, Thorne, Kopfhamer, Royce, and Neumaier failed to intervene, in violation of the Eighth Amendment.

(4) Defendants Casiana, Thorne, Suliene, and Steele failed to give Peterson appropriate treatment for the injuries he sustained during the use of force, in violation of the Eighth Amendment.

(5) Defendants Lane, Becher, Meisner, Facktor, Cole, Schuh, and Morgan improperly denied Peterson's grievances about the lack of treatment, in violation of the Eighth Amendment.

(6) Defendants Nickel, Blount, Hautamaki, Meisner, Francois, Facktor, and O'Donnell refused to allow Peterson to call witnesses at his disciplinary hearing, in violation of the Due Process Clause.

(7) Defendants Casiana, Kopfhamer, Royce, Neumaier, Agnew, and Richards fabricated testimony, leading to plaintiff being charged with battery and disorderly conduct, in violation of the Due Process Clause.

In his summary judgment materials, Peterson focuses on his claims related to the use of force and the medical care he received after the use of force, so I will begin with those claims.

## B. Excessive force

Peterson alleges that defendants Casiana, Haag, Kopfhamer, Royce, and Neumaier used excessive force against him in connection with the July 24, 2012 cell extraction. I understand Peterson to be alleging that defendants used excessive force in the following ways:

(1) Casiana intentionally twisted Peterson's wrist while Peterson was handcuffed;

(2) the officers slammed Peterson's head into the wall;

(3) the officers punched and kicked Peterson and applied pressure to various part of his body to force Peterson onto the floor;

(4) once Peterson was on the floor, the officers continued to punch and kick him and apply pressure and then struck him with a metal baton;

(5) during the cell extraction, defendant Haag placed extreme pressure on Peterson's head and the other officers failed to intervene;

(6) during Thorne's medical examination, defendant Haag placed extreme pressure on Peterson's head and defendants Casiana, Kopfhamer, Royce, and Neumaier failed to intervene;

(7) the officers dragged Peterson up a flight of stairs.[6]

I set forth the standard for an Eighth Amendment excessive force claim in the screening order. Dkt. 9, at 10. The question is whether the officer applied force "maliciously and

---

[6] Peterson also alleges in his declaration that officers Rataczak, Kyburz, and Risen put restraints on him too tightly, but these three officers are not defendants and Peterson does not allege that he complained to the named defendants about the restraints, so I have not considered this allegation.

sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The factors relevant to this determination include (1) why force was needed; (2) how much force was used; (3) the extent of the injury inflicted; (4) whether the defendant perceived a threat to the safety of staff and prisoners; and (5) whether efforts were made to temper the severity of the force. *Whitley*, 475 U.S. at 321. A defendant may be held liable for failing to stop another officer's use of excessive force if the defendant knew that the other officer was violating the plaintiff's constitutional rights and the defendant had a realistic opportunity to prevent the violation. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

It is undisputed the defendants Preston and Casiana exercised significant restraint for a good part of the evening, enduring verbal abuse and other disruptive behavior from Peterson without using any force at all. But it is also undisputed that eventually Preston's and Casiana's tolerance reached its breaking point and those two defendants, along with Haag, Neumaier, and Royce, had a violent confrontation with Peterson. The question raised by the state defendants' motion for summary judgment is whether a reasonable jury could find that the five officers' conduct was excessive under the Eighth Amendment standard.

The parties' submissions make it clear that the officers are not entitled to summary judgment as to most aspects of Peterson's excessive force claims. Peterson's undisputed conduct—the disruptive behavior, disrespectful and insulting comments, and noncompliance with orders—would justify discipline, though not necessarily the amount of force used in this case. *Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016) ("Willful non-compliance is not the same as actively resisting but instead a passive resistance requiring the minimal use of force.")

(internal quotations and alterations omitted); *Cyrus*, 624 F.3d at 863 (lesser amount of force justified when plaintiff not acting violently).

As an initial matter, defendant Haag admits that, after Peterson "calmed down" and the officers helped him to his feet, Haag placed his right hand on the back of Peterson's right hand and "attempted to move Peterson's hand towards Peterson's forearm in an attempt to cause discomfort and pain to generate voluntary compliance." Dkt. 87, ¶ 128. But defendants do not allege that Peterson was resisting at that point and they do not otherwise identify a reason for inflicting pain on Peterson then. Thus, a reasonable jury could find that Haag was acting to harm Peterson rather than maintain order and discipline. *Alicea v. Thomas*, 815 F.3d 283, 288–89 (7th Cir. 2016) (noting previous holding that "significant force is unreasonable after a suspect has stopped resisting").

More generally, the parties dispute many facts about the incident, including Peterson's statements and conduct leading up to the use of force, the reasons for particular actions taken by defendants, the amount of force that defendants used, and the degree of resistance that Peterson demonstrated. A jury will have to resolve those disputes. Summary judgment on Peterson's excessive force claim has been a long shot all along, because it was sufficiently clear from the allegations of Peterson's verified complaint that genuine issues of material fact likely would preclude judgment as a matter of law. *Cyrus*, 624 F.3d at 862 ("[S]ummary judgment is often inappropriate in excessive force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations.").

It is unclear which of the officers were involved in some of the alleged conduct. Peterson alleges that defendants Casiana and Haag engaged in particular acts, but he does not otherwise differentiate among the five defendants involved, presumably because he does not know which

defendant was acting at each point in time. Defendants do not seek dismissal of any of the excessive force claims on the ground that one or more of the defendants was not personally involved in the alleged conduct. Rather, both sides seem to assume that defendants Casiana, Haag, Kopfhamer, Royce, and Neumaier can be held liable for the use of force even if Peterson cannot identify which defendant took particular actions, an assumption that appears to be consistent with circuit law. *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012) ("[I]t is possible to hold a named defendant liable for his failure to intervene vis-à-vis the excessive force employed by another officer, even if the plaintiff cannot identify the officer(s) who used excessive force on him."). Regardless, the general rule on a motion for summary judgment is that the court should not consider issues that the parties do not raise, *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 820 (7th Cir. 2015), so it is unnecessary to determine now whether the defendants may be held jointly and severally liable. If defendants believe that Peterson needs to connect particular conduct with a particular defendant or if any party believes that a special jury instruction is needed on this issue, that party should raise the issue in his pretrial submissions.

I will grant defendants' motion for summary judgment as to one aspect of Peterson's excessive force claim. Peterson alleges generally that defendants "dragged" him up a flight of stairs, but, by his own assertion, he was unable to walk up the stairs on his own. It is also undisputed that Peterson needed to get up the stairs to be taken to his cell. He does not identify an alternative course of action that defendants could have taken. Thus, no reasonable jury could infer that defendants took Peterson up the stairs to harm him.

As for the amount of force used, Peterson does not describe what he means when he says that defendants "dragged" him and he does not offer any evidence to contradict

defendants' proposed finding of fact that the officers simply held Peterson underneath his arms to assist him. Even if it would be reasonable to infer that defendants were not as gentle as they could have been, that is not the standard under the Eighth Amendment. In light of the undisputed fact that defendants had a legitimate reason for bringing Peterson up the stairs and the absence of any specific evidence that defendants harmed Peterson or otherwise used an unreasonable amount of force at that point in time, defendants are entitled to dismissal of this part of Peterson's excessive force claim.

Before turning to the next set of claims, I note that Peterson includes in his brief a request that the court "suspend this case and order a federal investigation (criminal investigation) into this matter." Dkt. 93, at 2. Peterson did not include that request in his complaint, but even if he had, I could not grant the request. A federal court's role is to resolve disputes in the context of a lawsuit, not initiate criminal investigations. That role is reserved to the executive branch. *United States v. Batchelder*, 442 U.S. 114, 124 (1979).

## C. Medical care

### 1. Overview

I understand Peterson to be alleging that defendants violated his Eighth Amendment right to medical care in the following ways:

> (1) defendants Haag prevented him from describing his injuries to defendant Thorne, and defendants Casiana Kopfhamer, Royce, Neumaier, and Thorne failed to intervene;
>
> (2) defendant Thorne did not provide adequate treatment when she examined him on July 24, 2012;
>
> (3) defendants Steele and Suliene refused to examine him on July 26, 2012;
>
> (4) prison staff prevented him from obtaining a follow-up appointment until August 10, 2012;

(5) he did not receive an appointment with a physician until August 30; and

(6) from August 30 until his transfer to a different prison in January 2013, Suliene failed to provide appropriate care for his injuries.

A prison official violates a prisoner's Eighth Amendment right to medical care if the official is "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). The condition does not have to be life threatening. *Id.* A medical need may be serious if it "significantly affects an individual's daily activities," *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997), if it causes significant pain, *Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825 (1994). "Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the risk by consciously failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

Thus, a claim under the Eighth Amendment for failing to provide adequate medical care has three elements:

(1) Did the prisoner need medical treatment?

(2) Did the defendant know that the prisoner needed treatment?

(3) Despite his or her awareness of the need, did the defendant consciously fail to take reasonable measures to provide the necessary treatment?

On a motion for summary judgment, it is the plaintiff's burden to show that a reasonable jury could find in his favor on each of these elements. *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999). Defendants do not challenge Peterson's ability to show that he had a serious

medical need as to any of his medical care claims, so I need not consider that issue.

### 2. Alleged interference with the July 24, 2012 examination

Peterson alleges that defendant Haag prevented him from describing his injuries to Thorne during the July 24, 2012, examination and that the others present—Casiana Kopfhamer, Royce, Neumaier, and Thorne—refused to come to his aid. Defendants' only argument for dismissing this claim is that the officers did not prevent Peterson from describing his injuries to Thorne. But Peterson disputes this in his declaration, averring that he "was prevented from talking to the nurse (Thorne) by CO Haag applying constant painful pressure points in [Peterson's] chin and jaw. Capt. Casiana directed the nurse's evaluation." Dkt. 94, ¶ 38.

I repeat my observation from the screening order that Peterson's allegation is "somewhat bizarre," Dkt. 9, at 9, but it is not so bizarre that I can find it to be incredible as a matter of law. *Venson v. Altamirano*, 749 F.3d 641, 647 (7th Cir. 2014) (holding that court may not reject testimony that is "improbable" but only testimony that "is so implausible that the jury could not rationally believe it"; declining to find that standard was met by testimony that witness could hear statement from 300 feet away when there was traffic noise, witness was in enclosed car, and speaker was not directly facing witness). Because the issue is genuinely disputed, I will deny defendants' summary judgment motion as to this claim.

### 3. Thorne's July 24, 2012 examination

It is not clear whether Peterson intends to maintain a claim against defendant Thorne for failing to provide adequate treatment on July 24, 2012, apart from the claim discussed above that Thorne failed to intervene to allow him to describe his own injuries. Peterson says almost nothing else in his summary judgment materials about Thorne's conduct during the

examination. Peterson's only criticism of Thorne related to the examination is that she did not mention in her notes that his head was bleeding. But Peterson's sole piece of evidence to support a finding that his head was bleeding is a line in the incident report in which one of the officers stated that he "had blood on [his] shirt that came from Peterson's head." Dkt. 92-5. Peterson does not actually allege in his own declaration that he was bleeding, which is a curious omission.

Even if I assume that the incident report is sufficient to show that Peterson had been bleeding at some point, the report says nothing about the extent of the bleeding, whether Peterson was still bleeding during the exam, or whether any blood would have been visible to Thorne. In the absence of that type of evidence, no reasonable jury could find that defendant Thorne knew that Peterson had a serious medical need related to bleeding.

Peterson does not allege that Thorne was aware of the injury to his right arm or that her assessment of the injury to his leg was constitutionally inadequate based on the information she had at the time. Accordingly, I will allow Peterson to proceed on a claim that Thorne failed to intervene when Haag allegedly stopped Peterson from describing his symptoms, but I will otherwise grant summary judgment to Thorne on the claim based on the July 24, 2012 examination.

### 4. Refusal to examine Peterson on July 26

Peterson alleges that both Steele (a phlebotomist) and Suliene (a physician) refused to examine him on July 26 and directed him to file a health service request instead. I conclude that no reasonable jury could find on the current record that either defendant violated the Eighth Amendment by declining to treat Peterson on that date.

Suliene denies that she had any contact with Peterson on July 26, but even if she did, Peterson does not allege that he had an appointment to be treated by either Steele or Suliene on July 26. As for Steele, it is undisputed that she had a limited purpose when she saw Peterson, which was to draw his blood. She was not there to treat his injuries. Peterson does not allege that she was even qualified to treat him. As for Suliene, Peterson alleges that she was examining another patient and did not have time to treat him.

The Eighth Amendment does not a give a prisoner a right to treatment on demand. If prison medical staff had a constitutional duty to drop everything whenever a prisoner asked for nonemergency treatment, it is likely that they would not be able to provide effective care for any prisoner. Peterson does not allege that he gave Steele or Suliene any information suggesting that he required immediate treatment, so it was reasonable for them to direct Peterson to seek treatment in accordance with standard procedures. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("Delay is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.").

Peterson raises a new issue in his summary judgment brief, which is that Steele "violated [his] right to refuse [the blood draw] by failing to disclose its purpose." Dkt. 93-1, ¶ 14. But Peterson did not include this claim in his complaint, and the court did not allow Peterson to proceed on such a claim, so it is outside the scope of the lawsuit. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

Generally, that would be all that needs to be said about Peterson's claim against Steele. But there is a wrinkle in this case because defendant Steele has not answered the complaint,

even though she was personally served by the United States Marshals Service. Dkt. 64. Obviously, this means that Steele did not file a motion for summary judgment either. The general rule is that a court may not enter summary judgment on a claim unless the plaintiff had notice of that possibility. *Williams v. City of Chicago*, 733 F.3d 749, 755 (7th Cir. 2013).

In this case, the state defendants included proposed findings of fact about Steele, which Peterson did not dispute, and Peterson included his own discussion of Steele in his brief and declaration, suggesting that he considered his claim against Steele to be in play. In fact, Peterson seems to question whether he should have sued Steele in the first place, stating in his declaration that he believes "she was scapegoated" by prison officials. Dkt.94, ¶ 56. Thus, it would seem that allowing Peterson's claim against Steele to proceed would serve no legitimate purpose. But to avoid any potential unfairness to Peterson, I will give him an opportunity to show cause why Steele should not be dismissed from the case.

### 5. Delay in receiving follow-up appointment

It is undisputed that, after defendant Thorne's initial examination of Peterson on July 24, Peterson did not receive a follow-up appointment until August 10. But even if I assume that such a delay could violate the Eighth Amendment, Peterson has not adduced any evidence that one or more of the defendants is responsible for the delay.

It is undisputed that Peterson was scheduled for an appointment in the health services unit on July 27, but that appointment never took place. Defendants say that Peterson refused to see nursing staff on that date, citing an unsigned progress note. Dkt. 90-1, at 102. Peterson denies that he refused the appointment and I must accept Peterson's version of events for the purpose of defendants' summary judgment motion. *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). But making this assumption does not help Peterson because he does

not cite any evidence connecting the allegedly false progress note to one or more of the defendants. A jury may not infer without any evidence that a defendant delayed Peterson's care. *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("[I]t is well settled that conjecture alone cannot defeat a summary judgment motion.") (internal quotations omitted).

Peterson also alleges in his declaration that he "begged for medical care" before his August 10 appointment, Dkt. 94, ¶ 46, but he does not connect this allegation to a particular defendant or other staff member.[7] Instead, he cites a Department of Corrections log from July 26, 2012, in which it is noted that "HSU was informed" that Peterson believed his arm was broken. Dkt. 92-1, at 1. But "HSU" is not a defendant and there are other nurses in the health services unit besides defendant Thorne, the only nurse Peterson sued. To survive summary judgment, Peterson needed to come forward with some evidence that one of the defendants received the information.

The closest Peterson comes to showing that he gave notice to a particular defendant before August 10, 2012, is his July 27, 2012 grievance, in which he alleged that he had not yet received treatment for "extremely painful" injuries inflicted by staff.[8] Defendant Lane, an

---

[7] In his complaint, Peterson included a conclusory allegation that defendant Casiana ignored his requests for medical care between July 24, 2012, and August 10, 2012. Dkt. 1, at 12. Peterson does not repeat this allegation in his summary judgment materials, but even if he had, I could not consider the allegation because Peterson did not identify when or where he told Casiana about his medical issues, what he told Casiana, or how Casiana responded. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (to create genuine issue of material fact, party must set forth "specific facts"; party may not "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit").

[8] Peterson also cites a grievance and a letter from around the same time, but neither is helpful. In a July 24, 2012 grievance, he wrote that he "believe[d]" that his wrist and arm were broken. Dkt. 92-17, at 1. But Peterson was not seeking medical care in the grievance or complaining about not receiving medical care; he was complaining that the officers used excessive force against him. In that circumstance, the examiner would have had no reason to investigate

26

inmate complaint examiner, recommended dismissal of the claim on the ground that defendant Anderson, the health services unit manager, had stated that Peterson had received care in the health services unit. Defendant Becher affirmed the dismissal.[9]

Under the circumstances of this case, no reasonable jury could find that Lane, Becher, or Anderson violated the Eighth Amendment. As an initial matter, the court of appeals has held that inmate complaint examiners generally may not be held liable simply for denying a grievance. *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the [constitutional] violation."). In this case, Lane and Becher relied on information they received from Anderson, which they were entitled to do. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013). As for Anderson, she stated correctly that health services staff had treated Peterson on July 24. In light of the vague nature of Peterson's grievance, in which he alleged that he "had not received medical attention for [his] injuries," Dkt. 89-1, at 11, I cannot say that Anderson was required to investigate the matter further.

In sum, Peterson has not adduced evidence from which it may be reasonably inferred that any of the defendants prevented him from receiving medical care before August 10. Accordingly, defendants are entitled to summary judgment on this claim.

---

whether Peterson was receiving adequate medical care.

Peterson also sent a letter to defendant Anderson on August 2, 2012, but a different nurse responded to the letter (telling Peterson to file a health service request), and Peterson cites no evidence that Anderson ever saw the letter.

[9] Defendant Facktor also affirmed the dismissal, but that was not until October 2012, long after Peterson received a follow-up appointment. Dkt. 89-1, at 5. Facktor observed that Peterson had received additional care since he filed the grievance, suggesting that the grievance was moot.

### 6. Delay in receiving appointment with physician

It is undisputed that the nurse who examined Peterson on August 10 scheduled him to see a physician the following week. It is also undisputed that defendant Suliene did not examine Peterson until August 30. Again, even if I assume that the delay could violate the Eighth Amendment, Peterson has not adduced any evidence that any of the defendants are responsible for the delay. According to defendants' records, Suliene could not see Peterson as originally scheduled because she was away at that time and Peterson does not cite any contrary evidence. Defendants do not explain why Suliene was away and they do not say whether there was a substitute physician seeing prisoners in Suliene's absence. Regardless, Peterson has not adduced any evidence showing that Suliene or any of the other defendants were responsible for providing alternative care or were even aware that Peterson was seeking treatment at the time. The only communications discussed by any of the parties are between Peterson and nurses who are not defendants in this case. Again, in the absence of evidence that one or more of the defendants were responsible for the delay in care, defendants are entitled to summary judgment on this claim.

### 7. Suliene's treatment decisions

Suliene treated Peterson for injuries related to this case from August 30, 2012, to January 2013, when he was transferred to a different prison. A health care provider violates the Eighth Amendment when her treatment decisions are "blatantly inappropriate" or represent "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on [medical] judgment." *King v. Kramer*, 680 F.3d 1013, 1018–19 (7th Cir. 2012) (internal quotations omitted).

The parties offer opposing accounts of what happened at the August 30, 2012 appointment. Suliene says that she prescribed ibuprofen and a topical treatment for Peterson's pain. Peterson says that Suliene gave him no treatment. Defendants do not contend that Peterson did not have a need for *some* treatment on August 30, so a jury will have to resolve the factual dispute.

Suliene saw Peterson several more times before he was transferred. Peterson does not dispute that Suliene prescribed a number of treatments during that time, including EMGs for his wrists and right leg; splints for his wrists; ibuprofen, acetaminophen and gabapentin for pain; an ultrasound for his right leg; and a referral to an orthopedic specialist. Peterson does not challenge the wisdom of any of these decisions. Rather, his primary complaint appears to be that Suliene should have done more. In particular, he questions her failure to order more diagnostic testing such as an x-ray.

In light of later test results showing that Peterson may have fractured his wrist, it is understandable that Peterson would now point to the lack of an x-ray or MRI as evidence of deliberate indifference. But Peterson cannot prove a constitutional violation through hindsight. Peterson does not explain why he believes it should have been obvious to Suliene that he had broken or fractured his wrist at the time. Although he included allegations in his grievances that he believed something was broken, he does not allege that he told Suliene this and he does not cite evidence suggesting that his symptoms made it clear that an x-ray was needed. After all, it is undisputed that Peterson suffered from carpal tunnel syndrome, which is another condition that could have caused pain in his wrist.

Even if I assume that Suliene should have ordered an x-ray, Peterson cites no evidence that it would have led to any different treatment, even if an x-ray would have shown a fracture.

It is undisputed that Suliene ordered wrist splints for Peterson only a few days after she first examined him. Although the splints were meant to address his carpal tunnel syndrome, Peterson gives no reason to question that the splints could have helped a fracture as well and he cites no evidence that he would have needed a cast. Peterson also does not cite evidence showing that the fracture healed improperly or would have healed more quickly or less painfully if Suliene had taken a different course of action.

Peterson has not raised a genuine issue of material fact as to a need for an x-ray, but there is one other part of Peterson's claim against Suliene that will need to be resolved by a jury. In particular, defendants acknowledge that the EMG of Peterson's wrists showed that he was suffering from ulnar neuropathy, which is a separate condition from carpal tunnel syndrome. (Peterson says that the EMG showed radial nerve damage as well, but none of the parties provided a copy of the test results. Because I am denying defendants' motion for summary judgment on this claim, I need not decide in this order whether Peterson's testimony is admissible.) Presumably, defendants do not dispute that ulnar neuropathy qualifies as a serious medical need because Suliene referred Peterson to a specialist in January 2013. The question is why Suliene delayed her decision to make the referral. Although defendants do not say when Suliene received the results of the EMG, it was no later than November 1, 2012, which was when Suliene went over the results with Peterson.

Suliene identifies no treatment that she provided for the ulnar neuropathy before she made the referral more than two months later and she identifies no reason for failing to provide treatment. It is well established that an unjustified delay in treatment may violate the Eighth Amendment. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Without any explanation for the delay from Suliene, I cannot conclude as a matter of law that Suliene was exercising

medical judgment. Accordingly, I will deny defendants' summary judgment motion as to this claim.

## D. Other claims

Peterson includes little or no discussion in his summary judgment materials of any of the remaining claims on which he was allowed to proceed, suggesting that he has abandoned those claims. Even if they are not abandoned, I conclude that defendants are entitled to summary judgment on all of them.

First, as to Peterson's claim that defendant Preston violated the Eighth Amendment by putting pepper on his ice, the theory on which I allowed him to proceed was that the ice was intended for drinking to keep him cool, so the pepper could have interfered with that purpose. But it is now undisputed that Suliene prescribed the ice for Peterson to address joint pain; the ice was not intended for consumption. So even if it is true that Preston put pepper on the ice, Preston's alleged conduct did not deprive Peterson of treatment for a serious medical need.

Second, as to Peterson's claims about improperly denied grievances, I have already concluded that the claims related to grievances filed before August 10, 2012, must be dismissed. I allowed Peterson to proceed on claims about other grievances decided by defendants Meisner, Cole, Schuh, and Morgan as well, but both sides failed to propose facts about those grievances. Instead, the state defendants cite *George*, 507 F.3d at 609, for the proposition that grievance examiners generally cannot be held liable for denying a grievance and they argue that the examiners cannot be held liable in any event because Peterson received adequate medical care. Because Peterson does not respond to this argument or otherwise explain how these defendants violated his rights, I will grant the motion for summary judgment as to these defendants. *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014) ("At the summary

judgment stage of a proceeding, a plaintiff must put up or shut up and show what evidence he has that would convince a trier of fact to accept his version of events.") (internal quotations and alterations omitted).

Third, as to Peterson's claim that defendants Nickel, Blount, Hautamaki, Meisner, Francois, Facktor, and O'Donnell refused to allow him to call certain witnesses at his disciplinary hearing, it is undisputed that Peterson's request for the additional witnesses was rejected because he failed to show good cause for exceeding the default rule of allowing a prisoner to call two prisoner witnesses. Even now, Peterson does not explain the relevance of the rejected witnesses' proposed testimony. He includes a conclusory statement in his declaration that various prisoners "witnessed the myriad issues relating to this incident," Dkt. 94, ¶ 66, but he did not submit declarations from any of those individuals or provide any foundation for a belief that any of them have personal knowledge of the relevant events. Because it is well established that a prisoner does not have the right to present irrelevant or cumulative evidence at a disciplinary hearing, *e.g.*, *Scruggs v. Jordan*, 485 F.3d 934, 939–40 (7th Cir. 2007), I will grant summary judgment as to this claim as well.

Finally, I allowed Peterson to proceed on a claim under the Due Process Clause that law enforcement officers and prison officials fabricated allegations that Peterson assaulted correctional officers, leading to criminal charges for battery and disorderly conduct. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) ("We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way."). In their motion for summary judgment, the county defendants argue that the claims against them should be dismissed because defendant Richards (the sheriff) had no involvement in the

investigation and defendant Agnew (a detective) conducted an independent investigation and did not conspire with prison officials or fabricate evidence.

The state defendants argue that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars this claim as it applies to the disorderly conduct charge because Peterson was convicted of that charge and the conviction has not been invalidated. Under *Heck*, "a plaintiff may not recover damages under § 1983 when a judgment in his favor would necessarily imply the invalidity of a criminal conviction or sentence that has not been reversed, expunged, invalidated or otherwise called into question." *Matz v. Klotka*, 769 F.3d 517, 530 (7th Cir. 2014). The battery charge was dismissed, so *Heck* does not apply to that charge, but defendants deny that they lied to law enforcement officials and they question whether the rule in *Whitlock* applies when a plaintiff is not tried or convicted as a result of the allegedly false evidence.

Peterson does not discuss this claim in his brief and he does not dispute defendants' allegations that they did not fabricate evidence. Accordingly, I must accept defendants' proposed facts as true and grant summary judgment on this claim.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants Michael Meisner, Janel Nickel, Lon Becher, Timothy Casiana, Ryan Blount, Nathan Preston, Tracy Kopfhamer, Benjamin Neumaier, Scott Royce, Travis Haag, David Hautamaki, Dalia Suliene, Melissa Thorne, Karen Anderson, Joanne Lane, Cindy Francois, Cindy O'Donnell, Deirdre Morgan, Dennis Schuh, and Charles Facktor ("the state defendants"), Dkt. 75, is DENIED as to the following claims:

   a. defendants Casiana, Haag, Kopfhamer, Royce, and Neumaier used excessive force against Peterson in the context of a cell extraction on July 24, 2012;

   b. defendant Haag used excessive force against Peterson and prevented him from obtaining medical care during his July 24, 2012 examination, and

defendants Casiana, Kopfhamer, Royce, Neumaier, and Thorne failed to intervene; and

    c.   defendant Suliene denied Peterson medical treatment at the August 30, 2012 appointment and delayed treatment for his ulnar neuropathy for more than two months.

2.  The state defendants' summary judgment motion, Dkt. 75, is GRANTED in all other respects. Defendants Meisner, Nickel, Becher, Blount, Preston, Hautamaki, Anderson, Lane, Francois, O'Donnell, Morgan, Schuh, and Facktor are DISMISSED from the case.

3.  The motion for summary judgment filed by defendants Dennis Richards and Alexander Agnew, Dkt. 69, is GRANTED and those defendants are DISMISSED from the case.

4.  Peterson may have until November 20, 2017, to show cause why defendant Emily Steele should not be dismissed from the case. If Peterson does not respond by that date, I will construe his silence as a motion for voluntary dismissal of his claim against Steele.

5.  The parties motion to change the trial date, Dkt. 102, is GRANTED. The November 13, 2017 trial date is STRUCK. Once the court resolves Peterson's claim against Steele, the court will set a new schedule for the remainder of the case.

Entered November 2, 2017.

                    BY THE COURT:

                    /s/

                    _____

                    JAMES D. PETERSON
                    District Judge